# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CARRIE BETH GENT,
     Plaintiff,

     v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,
     Defendant.

No. 3:17-cv-02075 (SRU)

## RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

In the instant Social Security appeal, Carrie Beth Gent ("Gent") moves to reverse the

decision by the Social Security Administration ("SSA") denying her disability insurance

benefits.  The Commissioner of Social Security moves to affirm the decision.  Because the

decision by the Administrative Law Judge ("ALJ") was supported by substantial evidence, I

grant the Commissioner's motion and deny Gent's.

## I.     Standard of Review

The SSA follows a five-step process to evaluate disability claims.  *Selian v. Astrue*, 708

F.3d 409, 417 (2d Cir. 2013) (per curiam).  First, the Commissioner determines whether the

claimant currently engages in "substantial gainful activity."  *Greek v. Colvin*, 802 F.3d 370, 373

n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)).  Second, if the claimant is not

working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e.,

an impairment that limits his or her ability to do work-related activities (physical or mental).  *Id.*

(citing 20 C.F.R. §§ 404.1520(c), 404.1521).  Third, if the claimant does not have a severe

impairment, the Commissioner determines whether the impairment is considered "per se

disabling" under SSA regulations.  *Id.*  (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).

If the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment." *Id.* Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy." *Id.* (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)). The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria. *See id.*

The claimant bears the ultimate burden to prove that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he [or she] need not provide additional evidence of the claimant's residual functional capacity." *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide de novo whether a claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see Mongeur v. Heckler*,

722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374–75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447–48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375. Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II.     Facts

Gent applied for Social Security disability insurance benefits on February 6, 2015, alleging that she had been disabled since August 1, 2001. Later, she amended the alleged disability onset date to December 10, 2007. ALJ Decision, R. at 11. Gent identified her disabilities as, among other things, "discectomy of the lumbar spine, anxiety, and depression." Compl., Doc. No. 1 at ¶ 4. The SSA initially denied Gent's claim on June 15, 2015, finding that although Gent's "condition result[ed] in some limitations in [her] ability to perform work related activities, . . . [her] condition [was] not severe enough to keep [her] from working." Disability Determination Explanation (Initial), R. at 80. The SSA adhered to its decision upon reconsideration on January 12, 2016. Supplemental Security Income Notice of Reconsideration, R. at 144. Gent then requested a hearing before an ALJ, which was held on May 24, 2017. Tr. of ALJ Hr'g, R. at 37. At the hearing, ALJ Edward F. Sweeney questioned Gent and her non-attorney representative about Gent's three pending claims, which included applications for

Disability Insurance Benefits, Supplemental Security Income Benefits, and Disabled Adult Child Benefits. Tr. of ALJ Hr'g, R. at 37. During her testimony, Gent voluntarily withdrew both of her Title II claims, leaving only the claim for Supplemental Security Income. *Id.* at 41.

The ALJ questioned Gent about her work history, her alleged ailments, and her ability to perform daily working and living functions. From 2002 to 2007, Gent testified that she worked approximately 30 hours per week as a nanny. *Id.* at 44. She testified that she "took some classes in college," but has not worked at all since 2007. Gent also testified that she suffered from "excruciating pain that . . . kept [her] from being able to stand or even get out of bed." *Id.* at 45. Gent testified that she underwent back surgery in 2011; however, she could not "sit, stand, or walk for any amount of time." *Id.* Gent explained that she experiences panic attacks roughly twice a week, and that each episode lasts approximately 30 minutes. During her testimony, Gent described debilitating bouts of depression that last two or three days. She also testified that she suffers from incontinence, which limits her ability to "do things." When pressed, Gent clarified that she "[doesn't] have an accident, but [she] could almost have one almost every day, if [she] didn't make it to a bathroom in time." *Id.* at 51.

With respect to her lifestyle, Gent reported that she drives every day, shops for groceries, visits friends, uses a computer, and spends time outside with her dogs. *Id.* at 43–49. On occasion, Gent babysits for her friends. She also testified that she requires "a lot of assistance with household chores, especially laundry." *Id.* at 48. Gent explained that she could only prepare "quick snacks" because she could not stand for long periods in front of a stove. *Id.* at 49.

The ALJ also heard testimony from a vocational expert, Hank Lerner. The ALJ presented Lerner with a hypothetical of a person who "was limited to a range of work defined as light with occasional . . . balancing, stooping, kneeling, crouching, and crawling," and who could

"understand, remember, and carry out simple tasks in a setting with occasional public contact and occasional contact with co-workers." *Id.* at 57–58. Lerner testified that such a person could be employed in positions that require light levels of exertion, such as "unskilled, simple assembly positions." *Id.* at 58. In the second hypothetical, the ALJ asked Lerner to "further assume this individual is limited to a range of work defined as sedentary." *Id.* at 59. In response, Lerner listed various positions, classified as sedentary and unskilled, available in the national economy. *Id.* at 59. Lerner explained that some positions would require "some public contact" but the contact would be "fleeting . . . you know, seconds." *Id.* at 59. Lerner further testified that Gent would be unable to perform her past work as a nanny because the position of child monitor is defined by the <u>Dictionary of Occupational Titles</u> as a semi-skilled position requiring medium exertion. *Id.* at 58. When the ALJ presented the third hypothetical question to the vocational expert, he asked whether there were jobs available for an individual who required "periods of rest or absence or would otherwise have unpredictable periods of time off task." *Id.* at 60. Lerner replied that if the hypothetical person required periods of rest or absence "greater than 10%" of a typical workday, then jobs did not exist in the economy for that person. *Id.*

After the hearing, on June 7, 2017, the ALJ issued an opinion in which he found that Gent "ha[d] not been under a disability within the meaning of the Social Security Act since February 6, 2015, the date the application was filed." ALJ Decision, R. at 12. At the first step, the ALJ found that Gent "ha[d] not engaged in substantial gainful activity since February 6, 2015, the application date." *Id.* at 14. At the second step, the ALJ found that Gent's "status-post discectomy of the lumbar spine, anxiety, and depression" were "severe impairments" that "significantly limit[ed] [her] ability to perform basic work activities." [1] *Id.*

---

[1] The ALJ ruled that Gent's claimed urinary incontinence and obesity did not represent, "either singly or in

At the third step, the ALJ determined that "[Gent's] physical impairments, considered singly and in combination, [did] not meet or medically equal the criteria of any impairment listed in 1.04, 12.04, or 12.06." *Id.* at 15. The ALJ then assessed Gent's residual functional capacity and found that she could "perform light work . . . with occasional climbing of ramps and stairs; never climbing of ladders, ropes, or scaffolds; and occasional balancing, stooping, kneeling, crouching, or crawling." *Id.* at 17. The ALJ also determined that Gent was "able to understand, remember, and carry out simple tasks in a setting with occasional public contact and occasional contact with co-workers." *Id.*

Although Gent's residual functional capacity would not allow her "to perform any past relevant work," ALJ Sweeney determined that "there are jobs that exist in significant numbers in the national economy that [Gent] [could] perform." *Id.* at 24. Relying on "the testimony of the vocational expert," the ALJ ruled that Gent "[was] capable of making a successful adjustment to other work that exists in significant numbers in the national economy," and that "[a] finding of 'not disabled' [was] therefore appropriate." *Id.* at 25.

Gent requested a review of the ALJ's decision by the SSA's Appeals Council on June 20, 2017. Request for Review of Hearing Decision/Order, R. at 247. Finding that there was "no reason . . . to review the [ALJ]'s decision," the Appeals Council "denied [Gent's] request for review" on October 11, 2017. Notice of Appeals Council Action, R. at 6. Gent then filed a complaint in this Court on December 13, 2017, requesting that I reverse the Commissioner's decision. Compl., Doc. No. 1.

---

combination with everything else, more than a minimal limitation in the ability to perform basic work activities." Although Gent reported "experiencing some nighttime urinary incontinence, laboratory testing revealed generally normal findings." ALJ Decision, R. at 14–15. With respect to Gent's obesity, the ALJ explained that "the record [did] not show that [Gent] complained of any limitations or symptoms from this condition." *Id.* at 15.

### III.    Discussion

On appeal, Gent does not challenge the ALJ's findings that she "ha[d] not engaged in substantial gainful activity since February 6, 2015," ALJ Decision, R. at 14; that she suffered from a number of "severe impairments," such as "status-post discectomy of the lumbar spine, anxiety, and depression," *id.*; that her impairments did not "meet or medically equal the criteria of any impairment listed in 1.04, 12.04, or 12.06," *id.* at 15; and that "there are jobs that exist in significant numbers in the national economy" that a person with the residual functional capacity found by the ALJ could perform, *id.* at 24.  Instead, she attacks the ALJ's residual functional capacity finding at step four and the process by which the ALJ arrived at it.

The issues for my review are (1) whether the ALJ properly weighed the medical opinion evidence, (2) and whether the ALJ properly evaluated Gent's testimony.  The first issue appears partly to be a legal question subject to de novo review—insofar as it turns on whether the ALJ properly applied SSA regulations—and partly to be a factual question where the ALJ's "findings must be given conclusive effect so long as they are supported by substantial evidence."  *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (internal quotation marks omitted).  The second issue is a factual question that must be affirmed if there is substantial evidence supporting the ALJ's determination.

### A.    Did the ALJ properly evaluate the medical opinion evidence?

Gent argues that the ALJ's decision improperly gave only "partial weight" to opinions from Gent's treating physicians in determining Gent's residual functional capacity, and instead assigned "substantial weight" to non-examining state agency physicians.  Pl.'s Mem. Supp. Mot. J. Pleadings, Doc. No. 18 at 2.  With respect to Gent's physical impairments, the ALJ gave "partial weight" or "little weight" to the opinions of Dr. Phyllis Grable-Esposito, Gent's

neurologist, because Dr. Grable-Esposito's conclusion regarding the level of Gent's pain was not supported "with objective medical evidence and she failed to provide a functional assessment of [Gent's] abilities or limitations." ALJ Decision, R. at 21. Next, the ALJ assigned "partial weight" or "little weight" to the opinions of Dr. Thomas Rockland, Gent's treating physician since March of 2014, because Dr. Rockland's "opinions [were] inconsistent with [Gent's] documented activities." *Id.* The ALJ then assigned "significant weight" to the opinions of the State agency consultants because "their findings [were] consistent with the medical evidence . . . [and] the evidence submitted since they rendered their opinions [did] not show that [Gent's] conditions [had] significantly worsened." *Id.* at 23. With respect to Gent's mental impairments, the ALJ assigned "partial weight" to the May 2016 opinion of Advanced Practice Registered Nurse ("Nurse") Kitty Ansaldi because her opinion was only "partially consistent with the medical evidence of record as a whole," which supported "some level of limitation in [the] domains of functioning, [but did] not support the moderate-to-marked level of limitation opined" by Nurse Ansaldi. *Id.* at 22.

1. *Dr. Grable-Esposito and Dr. Thomas Rockland*

Gent contends that the ALJ should have given her treating physicians' opinions "controlling weight" under SSA regulations, Pl.'s Mem. Supp. Mot. J. Pleadings, Doc. No. 18 at 5 (citing 20 C.F.R. § 416.927(c)(2)), or—if the ALJ "did not err by refusing to adopt the physical limitations described by Drs. Grable-Esposito and Rockland"— he should have weighed the opinions "under all of the relevant factors [listed] in 20 C.F.R. § 416.927(c)(2)-(6)." *Id* at 6. The Commissioner responds that "the [ALJ] is not compelled to adopt, or even to assign the most weight to, a treating source opinion when there is sufficient contradictory evidence." Def.'s

Mem. Supp. Mot. Affirm, Doc. No. 22 at 4.  After examining the record, I agree with the Commissioner.

"The treating physician rule provides that an ALJ should defer to 'to the views of the physician who has engaged in the primary treatment of the claimant,'" but need only assign those opinions "controlling weight" if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record." *Cichocki v. Astrue,* 534 F. App'x 71, 74 (2d Cir. 2013) (summary order) (quoting *Green-Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir. 2003); 20 C.F.R. § 404.1527(c)(2)).  When the ALJ "do[es] not give the treating source's opinion controlling weight," she must "apply the factors listed" in SSA regulations, 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian,* 708 F.3d at 418.  After considering those factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion," *Halloran v. Barnhart,* 362 F.3d 28, 33 (2d Cir. 2004) and provide "good reasons" for the weight assigned.  *Burgess v. Astrue,* 537 F.3d 117, 129 (2d Cir. 2008).

The Second Circuit has held that "not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." *Id.* at 128.  For example, an expert's opinion is "not substantial, i.e., not reasonably capable of supporting the conclusion that the claimant could work where the expert addressed only deficits of which the claimant was not complaining, or where the expert was a consulting physician who did not

examine the claimant and relied entirely on an evaluation by a non-physician reporting inconsistent results." *Id.* (internal citations and quotations omitted).

The Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination," and has advised that, ordinarily, "a consulting physician's opinions or reports should be given little weight." *Selian,* 708 F.3d at 419; *Cruz v. Sullivan,* 912 F.2d 8, 13 (2d Cir. 1990). The question here is whether the ALJ sufficiently provided "good reasons" for weighing the opinions of the consultative physicians more heavily than the opinions of Gent's treating physicians. *See Burgess,* 537 F.3d at 129.

Although the treating physician rule applies to the opinions of Dr. Grable-Esposito, Gent's neurologist, and Dr. Thomas Rockland, Gent's treating physician, I conclude that ALJ Sweeney gave "good reasons" for not affording the treating sources' opinions controlling weight. *See Burgess*, 537 F.3d at 129; 20 C.F.R. § 404.1527(c)(2). Specifically, the ALJ found that Gent's treating sources' opinions were only "partially consistent with the medical evidence of record as a whole, which showed that [Gent] experienced some lower back and left leg pain, tenderness, and numbness due to her stenosis of the spine, radiculopathy, and disc extrusions but also showed she frequently displayed a normal gait and stance with only mild loss of strength of the lower extremities." ALJ Decision, R. at 21. The ALJ found that "while [the] evidence supports some level of physical limitation, it does not support the significant level of limitation opined here." *Id.*

### a. Dr. Grable-Esposito's Opinion

Gent argues that the ALJ gave only "partial weight" to the March 2015 and January 2016 opinions offered by board-certified neurologist Dr. Grable-Esposito. Pl.'s Mem. Supp. Mot. J. Pleadings, Doc. No. 18 at 2. In response, the ALJ states that the March 2015 and January 2016

opinions were "not consistent with other evidence that showed [Gent] frequently displayed a normal gait and stance, and [were] not entirely consistent with her documented activities, such as taking care of dogs and pigs, babysitting, light housework and yard work, and shopping." ALJ Decision, R. at 21. I agree with the ALJ. For example, on March 25, 2015, Dr. Grable-Esposito wrote that Gent was "limited in walking by severe spinal stenosis and [that] this [was] highly unlikely to change in the next 6 years." R. at 773. The treatment notes reflect that the diagnosis was partially related to Gent's request for Dr. Grable-Esposito to sign papers for a handicapped permit for her car. R. at 773. Conversely, on February 11, 2015, Dr. Grable-Esposito found that Gent exhibited "normal gait" and could "raise herself on her toes on the left leg." R. at 470. During the visit, Dr. Grable-Esposito recommended conservative treatment consisting of "heat and menthol rubs," as well as "massage for her muscle spasms," which seems inconsistent with the intensity noted in the March 25, 2015 opinion of "muscle cramping in her back and leg that is disabling." R. at 471, 771. Dr. Grable-Esposito's assessment of February 11, 2015 is supported by Nurse Ansaldi's treatment notes[2] of March 12, 2015 that documented Gent's "gait and station [as] normal." R. at 754. Nurse Ansaldi also noted that Gent was "seated quietly and comfortably" throughout their session. *Id.* Of note, Nurse Ansaldi observed a normal gait and station on March 12, 2015 (Tr. 753); June 16, 2015 (Tr. 757); September 16, 2015 (Tr. 760); November 16, 2015 (Tr. 763); December 7, 2015 (Tr. 767); June 16, 2016 (Tr. 800); August 4, 2016 (Tr. 812); and September 19, 2016 (Tr. 819). During a follow-up visit with Dr. Grable-Esposito on July 22, 2015, Gent reported that her walking tolerance had increased, but her neck had "been tight and cracking" from delivering baby pigs. R. at 776. In light of the conflicting

---

[2] Starting with Gent's first visit on April 10, 2007 and continuing through September 19, 2016, Nurse Ansaldi's treatment notes consistently document that Gent's gait and station are normal and/or that she is seated comfortably for the session.

evidence between Dr. Grable-Esposito's treatment notes, as well as the treatment notes of Nurse Ansaldi (i.e., observing a normal gait) and Gent's own statements indicating a higher level of functioning (i.e., delivering baby pigs), I find that the ALJ provided good reasons for finding Dr. Grable-Esposito's opinion on March 25, 2015 regarding Gent's work-related limitations "partially consistent with the medical evidence of record as a whole." *See* ALJ Decision, R. at 20–21, R. at 781.

Finally, on January 20, 2016, Gent returned to Dr. Grable-Esposito to complete "disability paperwork." R. at 778. "In her January 2016 opinion, Dr. Grable-Esposito opined that [Gent] could sit for four hours per workday, that she could stand and walk less than one hour per workday, that she could lift 10 pounds occasionally, that she would need unscheduled breaks, that she would be absent from work at least three times per month, and opined that she could not squat or bend over at all." ALJ Decision, R. at 20. The ALJ found Dr. Grable-Esposito's opinion inconsistent with evidence in the physician's own notes that showed Gent "frequently displayed a normal gait and stance," and exhibited a higher level of functionality in her documented daily activities. *Id.* at 21. Dr. Grable-Esposito did not discuss how Gent's previous self-reported daily activities comported with her conclusions, nor did she discuss the inconsistencies between her assessments and the observations of other practitioners. "Moreover, Dr. Grable-Esposito failed to support her opinions with objective medical evidence and she failed to provide a functional assessment of [Gent's] abilities or limitations." *Id.* Nonetheless, "as a treating source who supported her opinions with some objective medical evidence," the ALJ afforded Dr. Grable Esposito's opinion partial weight. *Id.* Although the evidence could support the opposite result, the substantial evidence in the record supports the ALJ's decision to give only partial weight to Dr. Grable-Esposito's opinions.

b. Dr. Thomas Rockland's Opinion

Gent asserts that the ALJ gave only partial weight to the Disability Impairment Questionnaire completed by Dr. Thomas Rockland in February 2017. Indeed, the ALJ found that Dr. Rockland's opinion that Gent could not stand for more than ten minutes and could not sit for more than one hour was "inconsistent with [Gent's] documented activities." *Id.* For example, the medical record contains evidence that Gent did not require the assistance of others when engaging in a full range of activities, such as, exercising her Labrador Retrievers, attending concerts,[3] driving, grocery shopping, dining out, going to the movies, going to the beach and starting a clothing business – activities that presumably required Gent to stand for more than ten minutes or sit for more than an hour. Tr. at 48–50; Activities of Daily Living, Tr. at 326–33. Gent argues that the ALJ committed legal error by (1) "fail[ing] to discuss the rigor of [her] daily activities and presum[ing] that those activities demonstrated a lack of disability;" and (2) "fail[ing] to mention important qualifying evidence regarding these activities." Pl.'s Mem. Supp. Mot. J. Pleadings, Doc. No. 18 at 4–5. Gent's argument is misplaced. Although the ability to perform activities of daily living, by itself, is not enough to establish a lack of disability, the regulations expressly identify "daily activities" as a factor the ALJ should consider in evaluating the intensity and persistence of a claimant's symptoms. 20 C.F.R. § 416.929(c)(3)(i).

In considering activities of daily living, "[t]he issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of [her] symptoms are consistent with the objective medical and other evidence." *Morris v. Comm'r of*

---

[3] "History of Present Illness . . . [h]oarseness . . . was at bar and screaming over band." R. at 490.

*Soc. Sec.*, No. 5:12-CV-1795 MAD/CFH, 2014 WL 1451996, at *6 (N.D.N.Y. Apr. 14, 2014).

Furthermore, the Second Circuit has held that the ALJ has discretion to resolve conflicts in the record, including conflicts with reported activities of daily living. *See, e.g.*, *Domm v. Colvin*, 579 F. App'x. 27, 28 (2d Cir. 2014) (summary order) ("Here, the ALJ pointed to substantial evidence for giving the narrative statement of [claimant's] treating physician . . . only probative weight, noting that [the physician's] restrictive assessment was inconsistent with . . . [claimant's] testimony regarding her daily functioning."); *Roma v. Astrue*, 468 F. App'x. 16, 19 (2d Cir. 2012) (summary order) (not error for an ALJ to use a claimant's participation in a "broad range of light, non-stressful activities" as evidence contradicting a treating source's opinion).

Contrary to Gent's allegations, the ALJ specifically acknowledged Gent's testimony regarding her reliance "on others to complete many tasks and household chores." ALJ Decision, R. at 17. The ALJ concluded, however, that the evidence overall "strongly suggest[ed] that [Gent] retained significant physical and mental abilities despite her complaints." *Id.* at 24. As a result, the ALJ determined that Gent's residual functional capacity did not preclude her from light work, subject to specified modifications.[4] "When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46 (2d Cir. 2010) (internal quotation marks and citations omitted). In the instant case, it is reasonable to conclude that Gent's daily activities are inconsistent with Dr. Grable-Esposito's and Dr. Rockland's opinions that Gent would be unable

---

[4] "The evidence of record as a whole supports a finding that the claimant is limited to the light exertional level with the identified postural and non-exertional limitations in the above residual functional capacity." ALJ Decision, R. at 11.

to, for instance, carry any amount of weight, sit for more than an hour or "squat or bend over at all." Tr. at 784–85, 881. Because a proper application of the treating physician rule could sustain a finding of no disability on this record, I find that the ALJ's determination applied the proper legal standards and was supported by substantial evidence. *Murdaugh v. Sec'y of Dep't of Health & Human Servs. of U.S.,* 837 F.2d 99 (2d Cir. 1988).

For the same reasons, I conclude that—after he decided not to give Dr. Grable-Esposito's or Dr. Rockland's opinions controlling weight—ALJ Sweeney properly evaluated the persuasiveness of the opinions under the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6). "An ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits [the court] to glean the rationale of an ALJ's decision.'" *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (per curiam). When evaluating the opinion evidence provided by Dr. Rockland and Dr. Grable-Esposito, the ALJ's determination was sufficiently specific regarding the consistency and supportability of the opinions. First, ALJ Sweeney observed that the "significant level of limitation" indicated by Gent's treating physicians was inconsistent with "other evidence that showed [Gent] frequently displayed a normal gait and stance with only mild loss of strength of the lower extremities;" "and [was] not entirely consistent with her documented activities, such as taking care of dogs and pigs, babysitting, light housework and yard work and shopping." ALJ Decision, R. at 21. The ALJ also found that neither physician's opinion was supported by "a functional assessment of [Gent's] abilities or limitations." ALJ Decision, R. at 21.

Gent argues that the ALJ did not make clear if he weighed the opinions under the relevant factors listed in 20 C.F.R. § 416.927(c)(2)-(6). Specifically, Gent claims that the ALJ failed to document whether he considered the specializations of the treating physicians, or the length of

Gent's treatment. Pl.'s Mem. Supp. Mot. J. Pleadings, Doc. No. 18 at 5. I agree that the ALJ

failed to document whether he considered all of the relevant factors listed in 20 C.F.R. §

416.927(c)(2)-(6). Although the regulations require the ALJ to consider certain factors, the

Second Circuit has held that no "slavish recitation of each and every factor" is required "where

the ALJ's reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 F. App'x.

67, 70 (2d Cir. 2013); *see* 20 C.F.R. § 404.1527(c) (outlining the factors to be considered). Here,

the ALJ's reasoning for why he did not give the treating physicians' opinion controlling weight

is clear and supported by substantial evidence. As a result, the ALJ's failure to document "the

frequency, length, nature, and extent of treatment," or "whether the physician is a specialist" did

not alter the ultimate nondisability determination. Accordingly, the ALJ's error was harmless.

Because "[i]t is not [my] function to determine de novo whether [Gent] is disabled," *Brault*, 683

F.3d at 447, nor "to resolve evidentiary conflicts" in the record, *Aponte v. Sec'y, Dep't of Health

& Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984), there was no error in the ALJ's decision not

to give controlling weight to Dr. Grable-Esposito's and Dr. Rockland's opinions.

2. *Non-Examining Sources*

Gent asserts that the ALJ committed error by giving "greater weight to opinions from

non-examining state agency medical consultants." Pl.'s Mem. Supp. Mot. J. Pleadings, Doc. No.

18 at 3. The Second Circuit has recognized that "[t]he opinions of non-examining medical

personnel cannot, in themselves and in most situations, constitute substantial evidence to

override the opinion of a treating source." *Schisler v. Sullivan*, 3 F.3d 563, 570 (2d Cir. 1993).

Social Security regulations, however, "permit the opinions of nonexamining sources to override

treating sources' opinions, provided they are supported by evidence in the record." *Id.* at 568

(citing 20 C.F.R. §§ 404.1527(f) [now (e) ] and 416.927(f) [now (e) ] ); *see also* Titles II & XVI:

Consideration of Admin. Findings of Fact by State Agency Med. & Psychological Consultants & Other Program Physicians & Psychologists at the Admin. Law Judge & Appeals Council, SSR 96-6p, 1996 WL 374180 at *3 (S.S.A. July 2, 1996) ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.").

As discussed above, Gent's treating providers' reports[5] and Gent's self-reported daily activities were found to be inconsistent with treatment notes contained in the medical record as a whole. Accordingly, because the ALJ did not *solely* rely on the non-examining medical opinions to discount Gent's treating providers' reports but instead awarded those opinions greater weight after deeming them consistent with other evidence in the record, he was within the bounds set by the Social Security regulations and Second Circuit law. Gent also complains that the non-examining consultants' opinions were made on a "nearly empty medical file." Pl.'s Mem. Supp. Mot. J. Pleadings, Doc. No. 18 at 3. Dr. Antonio Medina's case analysis, for example, did not take into account any treatment records after March 2015, or psychiatric records after June 2015, which comprise approximately a quarter of the file. *See*, *e.g*., (R. at 610, R. at 651–69; R. at 775–87; R. at 833–46) (exhibits wholly covering treatment periods after May 2015); (R. at 760–70; R. at 788–92; R. at 800–25) (exhibits wholly covering psychiatric records after June 2015).[6] Gent points to SSR 96-6p, which states that one appropriate circumstance in which a non-

---

[5] *See* Activities of Daily Living completed by Gent, R. at 326; Activities of Daily Living completed by Gent, R. at 342; Disability Impairment Questionnaire completed by Dr. Phyllis Grable-Esposito, R. at 781; Mental Impairment Questionnaire completed by Nurse Ansaldi, R. at 788; Disability Impairment Questionnaire completed by Dr. Thomas Rockland, R. at 878.

[6] Only visits to Dr. Rockland, Dr. Grable-Esposito and Nurse Ansaldi were noted. Visits to gynecologists and urologists were omitted.

treating source's opinion may be given greater weight than a treating source is when that opinion is "based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source." SSR 96-6p, 1996 WL 374180 at *3. But SSR 96-6p does not indicate that is the *only* circumstance in which a non-treating source's opinion can be given great weight; in fact, it begins the quoted sentence with the phrase "for instance," indicating that there may be other possibilities.

Here, the ALJ relied on his determination that the non-treating sources' opinions were consistent with other evidence in the file. Moreover, Gent has failed to point out any aspect of the non-treating sources' opinions that could not reasonably be considered to be consistent with the record, including portions of the record made after March 2015. For example, the additional medical evidence in the record that was not considered by the non-treating consultants includes the following: (1) Dr. Rockland's examinations from May 2015 through November 2016; (2) Nurse Ansaldi's observations from June 2015 to September 2016; and (3) Dr. Grable-Esposito's examinations in July 2015, January 2016, and July 2016. I will address the additional evidence submitted by each of Gent's treating providers in turn.

  a.  Additional Evidence Not Considered by Non-Treating Sources

First, the medical records submitted by Dr. Rockland after May 2015 primarily deal with Gent's abdominal complaints. From May 2015 to August 2015, Gent was under the care of Dr. Rockland for symptoms of nausea, vomiting, and diarrhea that she developed from "working with pigs." R. at 661. On September 3, 2015, Gent's reason for visiting Dr. Rockland is documented as "completing a form for her Social Security lawyers." R. at 669. At a follow-up visit two months later, Gent complained of "feeling down" because she had "just ended [a] very

long-term relationship in August." R. at 679. Dr. Rockland noted that she was "not suicidal" but she should call her psychiatrist because she was "quite depressed." R. at 683. In May and July of 2016, Gent had two routine visits with Dr. Rockland. In May, Gent reported feeling "neck pain and cracking" after starting a "clothing business with [her] best friend." R. at 837. In July, Dr. Rockland removed two benign warts from her leg. Finally, in November of 2016, Gent visited Dr. Rockland after suffering a fall and sustaining a laceration to her lip. Dr. Rockland ordered physical therapy to deal with Gent's neck pain and administered a flu shot during the visit. R. at 858. In sum, the additional visits with Dr. Rockland add little to what is already in the record about Gent's "discectomy of the lumbar spine, anxiety, and depression." Compl., Doc. No. 1 at ¶ 4. If anything, the evidence supports the ALJ's finding that Gent "retained significant physical and mental abilities despite her complaints." ALJ Decision, R. at 24.

From June 2015 to September 2016, Nurse Ansaldi documented an additional seven visits with Gent. With few exceptions, Nurse Ansaldi's mental status examinations and impressions are nearly the same for all of the visits, noting that Gent is "alert, cooperative and easy to engage." R. at 803. Moreover, her "gait and station are normal [and she is] [s]eated quietly and comfortably." *Id.* Gent's visit on August 4, 2016 stands out. During the visit, Nurse Ansaldi notes that Gent "feels terrible," and her affect is tearful. R. at 816. She documents, however, that "there is no evidence of suicidal, homicidal or violent ideation . . . [and the] MMSE revealed adequate recent knowledge, memory, attention, concentration, language use and fund of knowledge." R. at 816. The following month Nurse Ansaldi notes Gent's improved mood and bright affect. Nurse Ansaldi's treatment notes overall support the ALJ's finding that Gent "experienced some symptoms of depression, anxiety, anger, and panic during the relevant period but also showed she generally appeared alert and cooperative with adequate memory,

concentration, and attention." ALJ Decision, R. at 24. Thus, there is no reasonable probability that the outcome of the ALJ's decision would have been different had the non-examining physicians reviewed Nurse Ansaldi's treatment notes from June 2015 to September 2016.[7]

Finally, Dr. Grable-Esposito treated Gent on three separate occasions that were not considered by the non-examining sources – July 22, 2015; January 20, 2016; and, July 20, 2016. In July 2015, Gent presented with a "new problem of neck pain and paraspinal/periscapular muscle spasm and trigger points . . . [that was] most likely related to recent vomiting . . . ." R. at 777. Dr. Grable-Esposito referred Gent to physical therapy. In January, Dr. Grable-Esposito "spent the majority of the 40 min. visit filling out a detailed questionnaire for her disability application." R. at 780. Gent returned for a follow up visit in July of 2016. During the final visit, Dr. Grable-Esposito noted that Gent's "exam [was] stable," and she was "going out more and being more active," although she was "unable to walk barefoot due to foot discomfort." R. at 833. Again, I find that the evidence submitted by Dr. Grable-Esposito is consistent with and duplicative of the evidence that was before the non-examining sources when they rendered their opinions.

b. Critical Objective Tests

Gent contends that the non-examining physicians failed to consider "critical objective testing," including, an MRI completed in February 2015, and an EMG/NCS[8] from May 2014 that

---

[7] 20 C.F.R. § 404.970(a)(5) provides that the Appeals Council will consider new evidence "that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision."

[8] Electromyography (EMG) is often performed alongside NCS (nerve condition studies) to help detect the presence, location, and extent of diseases that damage nerves and muscles. In an EMG, nerves in muscles are stimulated through electrodes inserted into the muscle via small needles. The electrodes test electrical signals in the muscle. 2 Attorneys Medical Deskbook § 17:14. Nerve conduction studies (NCS) test the velocity of a nerve impulse. 1 Attorneys Medical Deskbook § 5:16.

showed "mild-to-moderate, mostly chronic, left L5 radiculopathy with reinnervation changes." Pl.'s Supp. Mem., Doc. No. 24 at 3. Gent's characterization of the non-examining physicians' reports is inaccurate. The Disability Determination Explanation dated June 2015, specifically notes both the EMG and the MRI in the "Findings of Fact and Analysis of Evidence." R. at 70. The state agency consultants relied on "medical and other information [including Gent's] age and education," to determine that Gent's condition of "chronic back pain due to spinal stenosis and post-discectomy" was "not severe enough to keep [her] from working." R. at 73, 80. Hence, the state agency consultants' opinions were not inconsistent with other evidence in the file.

In *Camille v. Colvin*, the Second Circuit rejected an argument that a non-examining source was "stale" solely because that source failed to review later submitted evidence, and the "additional evidence [did] not raise doubts as to the reliability of [the non-examining source's] opinion." 652 F. App'x 25, 28 n.4 (2d Cir. 2016). Because the additional evidence did not differ materially from the opinions that the non-examining physician did consider, the Second Circuit found that the ALJ committed no error by relying on the non-examining physician. *Id.* Here, the ALJ should have discussed more fully the evidence reviewed by the state agency consultants. In light of the entire record, however, the error does not warrant a remand. *Zhong v. U.S. Dep't of Justice*, 480 F.3d 104, 117 (2d Cir. 2006) (where error is harmless, remand is not warranted). Even in the face of an oversight, the ALJ's decision may be upheld if the error was "harmless," that is, if other "substantial evidence in the record" supports the ALJ's conclusions. *McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014); *Zhong*, 480 F.3d at 117 ("when overwhelming evidence in the record makes it clear that the same decision is inevitable," remand is not warranted); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (stating that harmless error may not necessitate remand to agency).

3. *Nurse Kitty Ansaldi*

Gent argues that the ALJ's decision improperly gave "'partial weight' to the opinions from treating Nurse Ansaldi rendered in May 2016." Specifically, the ALJ wrote that he gave "partial weight" or "little weight" to Nurse Kitty Ansaldi because her opinion was "only partially consistent with the medical evidence of record as a whole." ALJ Decision, R. at 22. Furthermore, "Nurse Ansaldi failed to support her opinions with objective medical evidence and her findings [were] inconsistent with her own mental status examination findings, which showed no significant or persistent concentration or cooperation problems." ALJ Decision, R. at 22.

In the instant case, the treating physician rule does not apply to Nurse Ansaldi's opinion because, as Gent notes, a nurse practitioner is not an "'acceptable medical [source]' within the meaning of the regulations (20 C.F.R. § 416.912 and § 416.927(a)(2))." Pl.'s Mem. Supp. Mot. J. Pleadings, Doc. No. 18 at 6. "[N]urse practitioners are considered 'other' medical sources . . . but their opinions are not entitled to the same weight as the opinions of an acceptable medical source." *Id.* (citing 20 C.F.R. § 404.1513(d)(1); Social Security Ruling 06-03p, 2006 WL 2329939). Although the regulations differentiate between "acceptable medical sources" and "other sources" (with nurse practitioners falling into the latter category), an ALJ is nonetheless required to review and account for all evidence in the case record. *See Jones-Reid v. Astrue*, 934 F. Supp. 2d 381 (D. Conn. 2012), *aff'd* 515 F. App'x. 32 (2d Cir. 2013).

Gent argues that "opinions from non-acceptable medical sources – such as statements from a treating nurse – must be considered in determining 'the severity of [the claimant's] impairment(s) and how it affects [the claimant's] ability to do work." Pl.'s Mem. Supp. Mot. J. Pleadings, Doc. No. 18 at 7 (citing 20 C.F.R. § 416.913(d); *see also* Social Security Ruling 06-03p, 2006 WL 2329939). Gent's argument that the ALJ erred by "not fully and appropriately

considering Ansaldi's opinions," however, is not persuasive.  Pl.'s Mem. Supp. Mot. J. Pleadings, Doc. No. 18 at 7.  I find that the ALJ's assignment of "partial weight" to the opinion of Nurse Ansaldi is supported by substantial evidence in the record; moreover, it reflects consideration of the treating relationship, as well as the factors listed in SSA regulations, 20 C.F.R. § 404.1527(c)(2).

First, the ALJ considered Nurse Ansaldi's opinion as "a treating source with a longitudinal history of treating [Gent's] condition."  ALJ Decision, R. at 22.  Next, the ALJ determined that Nurse Ansaldi's opinions were only "partially consistent with the medical evidence of record as a whole, which showed that the claimant experienced some symptoms of depression, anxiety, anger, and panic during the relevant period but also showed she generally appeared alert and cooperative with adequate memory concentration, and attention."  *Id.*  Finally, the ALJ found that Nurse Ansaldi's opinion reflecting a "moderate-to-marked level of limitation" was inconsistent with Gent's documented activities.  *Id*.  Gent cites to a Mental Impairment Questionnaire completed by Nurse Ansaldi on May 16, 2016 as support for Gent's "mental limitations."  Tr. 788–92; Pl.'s Mem. Supp. Mot. J. Pleadings, Doc. No. 18 at 7–8.  The questionnaire, however, is inconsistent with Nurse Ansaldi's progress notes dated between November of 2005 and March of 2015.  In the questionnaire, for example, Nurse Ansaldi lists the following signs and symptoms as support for Gent's diagnosis: obsessions or compulsions, suicidal ideation, difficulty thinking or concentrating, easy distractibility, agitation, and pressured speech.  The progress notes, on the other hand, consistently find Gent "cooperative and easy to engage," furthermore, she finds that Gent's speech is "spontaneous, with normal rate and

volume."[9]  Tr. 502–608.  Nurse Ansaldi notes that Gent's "articulation and coherence are excellent" and "there is no evidence of formal thought disorder . . . no evidence of delusions . . . no obsessions, compulsions or phobias . . . no evidence of suicidal . . . ideation, intention or planning."  *Id*. at 502.  Furthermore, the "MMSE revealed adequate recent and remote memory, attention, concentration, language use and fund of knowledge."  *Id*.  Finally, Ansaldi found that Gent's "[j]udgment regarding personal matters appear[ed] adequate." *Id.*  Given the conflict between the Mental Impairment Questionnaire and other evidence in the record, the ALJ did not err in choosing to give partial weight to Nurse Ansaldi's opinion.  *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.").

B.  Did the ALJ Properly Evaluate Gent's Testimony?

Gent asserts that the ALJ erred when he found that Gent's own statements regarding the "intensity, persistence, and limiting effects of her symptoms" were "'not entirely consistent with the medical evidence and other evidence in the record.'"  Pl.'s Mem. Supp. Mot. J. Pleadings, Doc. No. 18 at 11.

When evaluating the credibility of a claimant's testimony, in addition to considering the objective medical evidence in the record, the ALJ must consider the following factors:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

_____

[9] From December 2005 to March 2015, Nurse Ansaldi's examination notes consistently find that Gent is "alert, oriented and cooperative," her eye contact is direct, and her speech is normal and spontaneous.  Her mood and affect, on the other hand, vary with each visit.

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, SSR 96-7p, 1996 WL 374186 at *3 (SSA July 2, 1996).

The ALJ found Gent's testimony regarding the extent of both her physical and her mental limitations to be not entirely credible. With respect to the physical limitations, the ALJ does not appear to have explicitly discussed many of the SSP 96-7p factors—he discussed what he viewed as inconsistencies with the objective medical evidence and treatments, and evidence regarding Gent's ability to engage in the activities of daily living. ALJ Decision, R. at 20.

With respect to the mental health issues, despite making an earlier finding that Gent suffered from the "severe impairments" of depression and anxiety, the ALJ also stated that the extent of the limitations about which Gent complained were "not entirely consistent with the medical evidence and other evidence in the record." ALJ Decision, R. at 19. He stated that: "evidence contained in the record strongly suggests that the claimant [retained] significant physical and mental abilities despite her complaints." *Id.* at 20.

For instance, despite testifying that "she experiences panic attacks several times per week," "that she lives in a constant state of fear," and "that she often does not complete personal hygiene tasks due to her mental impairments," the ALJ observed that Gent self-reported "going out to restaurants . . . spend[ing] time with friends . . . go[ing] to public places, such as the beach or park . . . play[ing] games with her friends . . . start[ing] a clothing business with a friend," activities that "strongly suggest[ed] that [Gent] retained significant physical and mental abilities despite her complaints." *Id.*

Furthermore, despite Gent's testimony that she "[was] unable to work due to her difficulties with sitting, standing, or walking for any period of time and due to her inability to lift," she also "reported to her providers that she [had] been going outside and [had] become more and more active during the relevant period." *Id.* at 18–19. The ALJ notes that the medical record "consistently showed that [Gent] had a normal gait and stance, and showed she could sit comfortably during visits with providers, which strongly suggests she . . . retained significant sitting, standing, and walking ability despite her complaints." *Id.* at 19.

The ALJ correctly "t[ook] the claimant's reports of pain and other limitations into account" and "exercise[d] discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier*, 606 F.3d at 49. He did not, and "[was] not required to[,] accept the claimant's subjective complaints without question." *Id.*; *cf. Baladi v. Barnhart*, 33 F. App'x. 562, 564 (2d Cir. 2002) (summary order) ("treating physician's opinions . . . based upon plaintiff's subjective complaints of pain and unremarkable objective tests" were "not 'well supported by medically acceptable clinical and laboratory diagnostic techniques'" and not entitled to "controlling weight") (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)); *Calabrese v. Astrue*, 358 F. App'x. 274, 277 (2d Cir. 2009) (summary order)

("[W]here the ALJ's decision to discredit a claimant's subjective complaints is supported by substantial evidence, [the court] must defer to his findings.").

There is evidence in the record that is more favorable to Gent, and if I were deciding the case in the first instance, it might be reasonable to conclude that Gent's impairments were more disabling than the ALJ allowed. *See Campbell v. Astrue*, 596 F. Supp. 2d 446, 455 (D. Conn. 2009). Under the Social Security Act, however "[i]t is the function of the Secretary, not the reviewing courts, to resolve evidentiary conflicts" and "to determine . . . whether [Gent was] disabled." *Aponte*, 728 F.2d at 591 (other internal alterations omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier*, 606 F.3d at 49 (internal quotation marks omitted). Because the ALJ's opinion adequately meets that "very deferential" standard, I affirm the decision below. *See Brault*, 683 F.3d at 448.

## IV. Conclusion

For the reasons stated, I deny Gent's Motion for Judgment on the Pleadings, Doc. No. 18, and grant the Commissioner's Motion to Affirm, Doc. No. 22. The Clerk is directed to enter judgment for the Commissioner and close the case.


So ordered at Bridgeport, Connecticut, this 26th day of March 2019.


/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge